# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ALABAMA
### Northwestern Division

| | | |
|---|---|---|
| NATIONAL PARKS CONSERVATION | ) | |
| ASSOCIATION, INC. and | ) | |
| SIERRA CLUB, | ) | |
| | ) | |
| **Plaintiffs** | ) | |
| v. | ) | **Civil Action No.-01-403-VEH** |
| | ) | |
| TENNESSEE VALLEY AUTHORITY | ) | |
| | ) | |
| **Defendant.** | ) | |

---

## MEMORANDUM OPINION ON TVA MOTION FOR PARTIAL SUMMARY JUDGMENT (FIRST AND SECOND CAUSES OF ACTION - STATUTE OF LIMITATION)

Plaintiffs National Parks Conservation Association, Inc. ("NPCA") and Sierra Club, Inc. ("Sierra Club") have filed an action under the citizen suit provision, 42 U.S.C. § 7604(a) of the Clean Air Act ("CAA", "the Act"), 42 U.S.C. § 7401 *et seq*. (2000), asserting  Tennessee Valley Authority ("TVA") violated the CAA  by its 1982 construction work ("the work") at Unit 5 of TVA's Colbert County electricity generating plant ("Colbert 5").[1]  The allegations at issue are found in NPCA's Second Amended Complaint ("SAC").  (Doc. 80)

The court has before it  TVA's Motion for Partial Summary Judgment (doc. 99)

---

[1]  For economy's sake, "NPCA" shall mean "NPCA and Sierra Club" unless the context clearly indicates otherwise.

("the TVA motion"), brief (doc. 100), and supporting exhibits (doc. 101) seeking entry of judgment in favor of TVA and against NPCA on the First and Second Causes of Action because, TVA says, the statute of limitations has expired. NPCA has filed an Opposition with supporting exhibits. (Doc. 104) TVA has filed its Reply to the NPCA opposition, with additional exhibits. (Doc. 142) TVA filed supplemental case law authority (doc. 145), as did NPCA (doc. 207), and TVA responded with additional supplementary authority (doc. 208). The applicable statute of limitations is five (5) years, 28 U.S.C. § 2462[2], the "general" statute of limitations.

In the First Cause of Action, ¶¶ 1 - 72, , which NPCA calls "The PSD Violations," NPCA claims the work at Colbert 5 constituted a "'major' modification"[3] as defined by the Act, 42 U.S.C. § 7411(a), and the Alabama State Implementation Plan ("SIP")[4], 42 C.F.R. § 52.69(c)(32), and Alabama Air Pollution Control Commission ("AAPCC") Regulation 16.4.2(b)(1). NPCA says the work at Colbert 5 created a potential for significant net emissions increase of particulate matter

---

[2] "Except as otherwise provided by Act of Congress, an action, suit or proceeding for the enforcement of any civil fine, penalty, or forfeiture, pecuniary or otherwise, shall not be entertained unless commenced within five years from the date the claim first accrued ..."

[3] The definition section quoted by NPCA in the SAC says "modification", not "major modification", *see* 42 U.S.C. § 7411(a)(5).

[4] This term and the many other acronyms used in this opinion, the parties' pleadings, and the case law, are discussed and defined in Parts I. and II., *infra*.

("PM"), nitrogen dioxide ("$NO_x$"), and sulfur dioxide ($SO_2$).[5]  Further, the work was performed without a Prevention of Significant Deterioration ("PSD") Permit, and the Best Available Control Technology ("BACT") was not used.  NPCA says the failure to obtain the PSD permit at the time of the work and operating without it since violate the Act.

The Second Cause of Action, ¶¶ 1 - 80, which NPCA calls "The NSR Violations", alleges a violation of the Nonattainment New Source Review ("NNSR") provisions of the Act, the CFR regulations and the AAPC regulations.  NPCA says Colbert 5 was, from 1980 to 1993, located in a "Nonattainment" area for $SO_2$, and that the work increased potential $SO_2$ emission by one hundred (100) tons per year or more.  As a consequence, TVA was required to, but did not, obtain a Nonattainment NSR permit, and has been operating since in violation of the Act.  As part of the required NNSR permit, TVA should have installed appropriate air pollution controls to achieve and maintain the lowest achievable emissions rate ("LAER")[6].

Before turning to the issues before it, there will be a general overview of the

_____

[5]  Three criteria pollutants – particulate matter (PM), nitrogen dioxide ($NO_2$; more generally, all oxides of nitrogen are known as $NO_x$) and sulfur dioxide ($SO_2$) – are at issue in this case.

[6]  In areas that meet NAAQS ("attainment" areas) , the Act requires the use of BACT.  In nonattainment areas, the more stringent LAER is triggered.  As noted, Colbert 5 was partially nonattainment during some of the years covered by NPCA's Second Amended Complaint.  These matters are discussed in more detail in I. and II., *infra*.

Act (Section "I"), followed by a detailed history, lifted from *New York v. US EPA*,

413 F.3d 3 (D.C. Cir. 2005), of the legal and regulatory history of the emissions

regulations (Section "II").

I. **THE CLEAN AIR ACT**

The Clean Air Act is codified at 42 U.S.C. §§ 7401-767 (2000). The

implementing regulations are found at 40 C.F.R., pts. 50-99. The original Act and the

amending legislation can be found, respectively, at Clean Air Act Amendment of

1970, Pub. L. No. 91-604, 84 Stat. 1676 (1970); Clean Air Act Amendments of 1977,

Pub. L. 95-95, 91 Stat. 685 (1977); Clean Air Act Amendments of 1990, Pub. L. No.

101-549, 108 Stat. 2399 (1990).

> "New source review" denotes a series of provisions within the federal Clean
> Air Act (Act). Congress enacted the Clean Air Act in 1970, with major
> amendments occurring in 1977 and 1990. The Act represents one of the
> federal government's earliest efforts to protect the environment through a
> comprehensive regulatory scheme.
>
> The Clean Air Act requires the Environmental Protection Agency to establish
> baseline "national ambient air quality standards" (NAAQS), setting maximum
> permissible concentrations for "criteria" pollutants. The Act divides the United
> States into two types of regions: those that are currently in compliance with all
> of the NAAQS standards ("attainment areas"), and those that are violating
> some or all of these standards ("non-attainment areas"). The Act establishes
> different emissions requirements for facilities in each region, with stricter
> standards applicable to facilities in non-attainment areas.
>
> The 1977 Amendments to the Clean Air Act incorporated the new source
> review provisions. These provisions were designed to ensure that large

4

industrial sources of air pollution included modern pollution-control equipment when they altered their facilities.  New source review mandated that the "best" emissions-control technology be installed whenever a "major" source were built, replaced, or modified (creating, in NSR terminology, a "new source" of air pollution).  NSR provides an exception to this best-technology requirement for some "routine maintenance" to major sources.

What qualifies as the "best" technology in turn depends on the ambient air quality in the surrounding region. Facilities seeking to build or modify equipment in attainment areas are subjected to "prevention of significant deterioration" (PSD) review.  To proceed with their proposed projects, facilities must determine whether new or increased emissions resulting from these projects would cause the area to exceed ambient air quality standards or to suffer a "significant" deterioration in air quality.  PSD review requires that any new source adhere to the "best available control technology" (BACT) standard, governing emissions of regulated pollutants.    BACT, a source-specific standard, is generally understood to require the best pollution-control technology available, after taking into account energy, economic and environmental considerations.

Facilities seeking to build or modify structures in NAAQS non-attainment areas are subject to more stringent requirements. These facilities must obtain pre-construction permits, certifying that pollution from any new source will not hinder the region's progress towards attainment of the NAAQS standards.  New sources must install emissions-control equipment that meets the stringent "lowest achievable emissions rate" (LAER) standards.   LAER standards are generally stricter than BACT standards, because they are set without any consideration of energy or economic factors.  Facilities seeking to add sources in non-attainment areas must show, furthermore, that they plan to "offset" any projected emissions increases from these new or modified sources with emissions decreases in other areas of the same facility or from other facilities in the non-attainment area.

Martin, The Reform of New Source Review: Toward A More Balanced Approach, 23 Stan. Envtl. L.J. 351, 356-58 (2004) (citations omitted)

    The Act establishes a program of "cooperative federalism" with a "division of

labor between individual states and EPA" for the attainment and maintenance of national air quality goals. *Sierra Club v. EPA*, 315 F.3d 1295, 1300 (11th Cir. 2002). EPA's responsibility is to set air quality standards. For pollutants meeting certain criteria, EPA is responsible for promulgating national ambient (i.e., outdoor) air quality standards, ("NAAQS"). 42 U.S.C. § 7409(a) (2000). These standards must be sufficient to protect the public health (with an adequate margin of safety) and the public welfare (including effects on soils, water, vegetation, manmade materials, animals, visibility, etc.) from any known or anticipated adverse effects. 42 U.S.C. §§ 7409(b)(1) & (2) (2000); 42 U.S.C. § 7602(h) (2000). In turn, a state, to achieve national air quality standards, adopts an air quality plan known as a State Implementation Plan ("SIP") that controls emissions from specific sources. 42 U.S.C. § 7410.

Both the CAA and the SIPs enacted by states regulate new and existing major stationary sources of air pollution differently. In general, *new* sources – i.e., sources constructed or "modified" after the effective date of the applicable statute or implementing regulation – must undergo preconstruction review and permitting, and, as part of this permitting process, are required to install emission controls capable of meeting specified emission rates. The thinking at the time Congress chose to impose these obligations on new sources was that, as old plants were retired and new power

6

plants built, the new plants or sources could incorporate these more stringent emissions controls into their design and construction more cost-effectively and efficiently than existing sources. *See, e.g.,* H.R. Rep. No. 95-294, 95th Cong., 1st Sess., at 185, *reprinted in* 1977 U.S.C.C.A.N. 1077, 1264 (1977).[7]

There are three (3) separate new source programs under the CAA. The oldest of these is the federal New Source Performance Standards program (NSPS) enacted in 1970, 42 U.S.C. § 7411. The other two new source programs – Nonattainment New Source Review (NNSR) and Prevention of Significant Deterioration (PSD) – were enacted in 1977 and are companion programs that apply on a pollutant-by-pollutant basis depending on whether the source is located in an attainment area (PSD) or a nonattainment area (NNSR) for that pollutant. *See generally, TVA v. Whitman*, 336 F.3d 1236, 1244 nn.12-14 (11th Cir. 2003); *United States v. Duke Energy Corp.*, 278 F. Supp. 2d 619, 627-30 (M.D.N.C. 2003). The requirements of the Alabama PSD and NNSR provisions are triggered when a new source is built or when an existing major

---

[7] Congress' reasoning was sound; the consequences most likely unintended. For a number of reasons, ranging from decreased demand for electricity, energy prices that were considerably lower than projected at the time (1970), to local opposition ("not in my back yard" or "NIMBY" litigation), and increased construction costs, there were very few new power plants built in the decades after enactment of the CAA, and the industry instead "stretched" the life expectancy of its facilities through "life extension" projects. This in turn led to litigation over what work at a given plant makes that plant or unit a "new source" and what work falls under the "routine maintenance and repair" exception and is therefore exempt from NSR/NNSR/PSD requirements and permitting. This tension is seen most recently in response to a series of 1999 enforcement actions filed by the EPA in the waning days of the second Clinton administration.

stationary source constructs a "major modification."  *See* AAPCC Regulations 16.4.8 (Ex. 5 at 10) & 16.3.2(c) (Ex. 6 at 16-8).  If triggered, these new source requirements require installation of pollution control equipment that represents best available control technology (BACT) (under the PSD program) or lowest achievable emission rate (LAER) (under the NNSR program).

*Existing* sources, by contrast, fall under other provisions of the Act.  Existing sources are not required to install emission controls such as BACT or LAER unless, among other things, work performed there is a "major modification" as discussed above.  The court does not understand NPCA to allege TVA has violated these provisions with respect to Colbert 5 except to the extent describe above, i.e., the failure to obtain the permits NPCA says  were required by the work.[8]  These include the emissions limitations and other requirements established by the states in their SIPs to achieve EPA's NAAQS, hazardous air pollutant standards, visibility protection programs, and acid rain control programs.  42 U.S.C. §§ 7410, 7412, 7491, 7492 & 7651-7651o (2000).  TVA says, and NPCA agrees, that the area around the entire Colbert plan is in attainment of all national air quality standards and has been in attainment since the early 1990's.  Undisputed fact 17, SAC ¶¶ 18 -19.

---

[8] As described in II., *infra*, certain plants were, because of their age, "grandfathered".  Colbert 5 is part of one such plant.

For further discussion of the interplay see II, *infra*, and *compare, e.g., United States v. Ohio Edison*, 276 F.Supp. 2d 829 (S.D. Ohio 2003), with *United States v. Duke Energy Corp*., 278 F.Supp. 2d 619 (M.D.N.C. 2003); and *Wisconsin Electric Power Co. v. Reilly*, 893 F.2d 901 (7th Cir. 1990) ("*WEPCO*"), with *U.S. v. Duke Energy*, 411 F.3d 539 (4th Cir. 2005).

As to the interplay of the emissions limitations of the Clean Air Act, Alabama's emissions regulations promulgated thereunder, and the effect of Alabama's State Implementation Plan (SIP) on those regulations, reference is made to the Eleventh Circuit's decision in *Sierra Club  v. TVA*, ____ F.3d ____,Slip Opinion No. 04-15324, 2005 WL 3110516 (11th Cir., November 22, 2005), where the Court of Appeals, in an action also involving TVA's Colbert plant, affirmed in part, reversed in part, and remanded this Court's September 14, 2004 Memorandum Opinion and Order in *Sierra Club  v. TVA*, No. CV-02-2279-VEH (TVA Ex. 31).  (*Inter alia*, Alabama's ADEM 2% de minimis emissions rule violates the Act, was never approved by the EPA, and therefore never became part of Alabama's SIP).  More on *Sierra Club  v. TVA* later.

Alabama's PSD program has also been recently reviewed by this court, *United States v. Alabama Power Co.*, 372 F.Supp. 2d 1283 (N.D. Ala. 2005). Alabama's NNSR program is similar.

## II.  **The Regulatory and Litigation History Of The CAA Emission Rules**

With Section I., above, as an overview, the court turns to the D.C. Circuit's recent capsulation of the applicable CAA amendments, EPA's various sets of rules governing emissions from various sources, and the interplay of Congressional action, EPA's responses, and industry's litigation challenges to EPA's actions through the various sets of rules:

Congress passed the 1970 amendments "to protect and enhance the quality of the Nation's air resources so as to promote the public health and welfare and the productive capacity of its population." 42 U.S.C. § 7401(b).  The amendments set out a two-step process for achieving this goal:  EPA first develops "National Ambient Air Quality Standards" ("NAAQS") for various pollutants, and states then create and implement plans, known as "State Implementation Plans" ("SIPs"), to ensure their air meets these standards.  *See id.* §§ 7409-7410.

The amendments also required new or modified sources to conform to emissions limits, known as "New Source Performance Standards" ("NSPS"), set by EPA. *See id*. § 7411.  Because "[t]he Act contemplated" that these criteria would be "more stringent than those needed to meet ... NAAQS," *Alabama Power Co. v. Costle,* 636 F.2d 323, 346 (D.C.Cir.1979), the meaning of "modified sources" took on particular significance:  if an existing source made a "modification," it needed to conform its change to NSPS, whereas an unmodified source only needed to meet whatever lesser requirements (if any) the SIP imposed for attaining NAAQS.  Congress provided the following definition for "modification":

any physical change in, or change in the method of operation of, a stationary source which increases the amount of any air pollutant emitted by such source or which results in the emission of any air pollutant not previously emitted.

42 U.S.C. § 7411(a)(4).  This definition requires *both* a change--whether physical or operational--*and* a resulting increase in emissions of a pollutant.

10

EPA's 1975 NSPS regulation, like its earlier 1971 regulation, elaborated upon this statutory definition, doing so in provisions whose meaning the parties debate today.  One part of the 1975 regulation provided that " '[m]odification' means any physical change in, or change in the method of operation of, an existing facility which increases the amount of any air pollutant (to which a standard applies) emitted into the atmosphere by that facility."  40 Fed.Reg. 58,416, 58,418 (Dec. 16, 1975);  *see also* 36 Fed.Reg. 24,876, 24,877 (Dec. 23, 1971).  Using somewhat different terms, another part of the 1975 regulation stated that "any physical or operational change to an existing facility which results in an increase in the emission rate to the atmosphere of any pollutant to which a standard applies shall be considered a modification within the meaning ... of the Act," with "[e]mission rate ... expressed as kg/hr of any pollutant discharged into **\*12** the atmosphere."  40 Fed.Reg. at 58,419.  Yet neither the 1975 regulation nor its preamble explained why EPA found it necessary to offer these two separate glosses on "modification."

Adding to the confusion, EPA put forth yet another definition of "modification" in a 1974 regulation implementing what became known as the regulatory "Prevention of Significant Deterioration" ("PSD") program.  Seeking to prevent backsliding in regions whose air quality met NAAQS, this program required new sources and sources undertaking modifications to obtain preconstruction permits.  *See Alabama Power,* 636 F.2d at 346-49 (describing the regulatory PSD program).  The regulation defined "modification" in a manner that closely tracked--but didn't precisely mirror--the NSPS regulatory definition, stating that "[t]he phrases 'modification' or 'modified source' mean any physical change in, or change in the method of operation of, a stationary source which increases the emission rate of any pollutant for which a national standard has been promulgated."  39 Fed.Reg. 42,510, 42,514 (Dec. 5, 1974).  The regulation's preamble further provided that the term "modified source" was meant "to be consistent with the definition used in [NSPS]."  *Id.* at 42,513.

Both the NSPS and PSD regulations listed certain exceptions to what constitutes a "modification," though once again the precise content of the regulations varied.  The 1974 PSD and the 1971 NSPS regulations provided that:

(1) Routine maintenance, repair, and replacement shall not be considered a physical change, and (2) The following shall not be considered a change in the method of operation:  (I) An increase in the production rate, if such increase does not exceed the operating design capacity of the source;  (ii) An increase

11

in the hours of operation;  (iii) Use of an alternative fuel or raw material [under certain conditions].

*Id.* at 42,514;  *accord* 36 Fed.Reg. at 24,877.  The 1975 NSPS regulation not only phrased its exceptions differently, but also added a few additional ones:

The following shall not, by themselves, be considered modifications under this part:  (1) Maintenance, repair, and replacement which the Administrator determines to be routine ...;  (2) An increase in production rate of an existing facility, if that increase can be accomplished without a capital expenditure on the stationary source containing that facility;  (3) An increase in the hours of operation;  (4) Use of an alternative fuel or raw material [under certain conditions] ...;  (5) The addition or use of any system whose primary function is the reduction of air pollutants ...;  (6) The relocation or change in ownership of an existing facility.

40 Fed.Reg. at 58,419-20.

In its various permutations, this regulatory framework had not been long in place when, in 1977, Congress amended the CAA yet again. These amendments drew upon, expanded, and superceded the regulatory PSD program.  In particular, the amendments strengthened the Act by (1) expressly creating a preconstruction review process for new or modified major sources located in "nonattainment" areas (i.e., areas which failed to meet NAAQS), *see generally* 42 U.S.C. §§ 7501-7515;  and (2) expressly providing a parallel preconstruction review process in PSD areas (i.e., areas which met NAAQS or where there was insufficient information to evaluate whether NAAQS were met), *see generally id.* §§ 7470-7492.  The parties refer to the first as "Nonattainment New Source Review" ("NNSR"), to the second as "Prevention of Significant Deterioration" ("PSD"), and to both collectively as "New Source Review" ("NSR").  We shall do the same.

Under the amendments, sources seeking NNSR permits must meet stricter requirements than sources seeking PSD permits.  Most notably, for NNSR permits, sources must achieve the "lowest achievable emission rate" ("LAER") for new or modified units, whereas sources seeking PSD permits need only use the less demanding "best available control technology" ("BACT").  At a minimum, LAER and BACT are as restrictive as NSPS. *Id.* § 7479(3) ("In no event shall application of

12

[BACT] result in emissions of any pollutants which will exceed the emissions allowed by any applicable standard established pursuant to" NSPS); *accord id.* § 7501(3) (for LAER). In certain circumstances, however, BACT and LAER can be more stringent than NSPS. *See id.* § 7479. Moreover, to obtain NNSR permits, sources must arrange for emissions reductions at other sources such that the modifications produce no increase in overall regional emissions. *Id.* § 7503. Sources must also demonstrate that any other sources owned by the same company comply with CAA requirements. *Id.* To obtain PSD permits, sources must undergo ambient air quality analyses to show that they will neither violate NAAQS increments nor adversely affect air quality in national parks or other areas that EPA has designated as needing particularly high-quality air. *Id.* § 7475.

Congress meant NSR to apply to both new *and modified* sources. Due to a technical defect, however, Congress initially achieved this goal only in the NNSR portion of the amendments, which defined modification by reference to the NSPS definition: "The terms 'modifications' and 'modified' mean the same as the term 'modification' as used in section 7411(a)(4) of this title." *Id.* § 7501(4). By contrast, the PSD portion of the amendments applied initially to new sources only. Congress corrected this in a technical amendment passed several months later, which applied the PSD program to sources that were to undergo modifications "as defined in section 7411(a) of this title." Pub.L. No. 95-190, § 14(a)(54), 91 Stat. 1393, 1402 (1977) (codified at 42 U.S.C. § 7479(2)(C)). As the legislative history explains, this "technical and conforming" amendment "[i]mplements conference agreement to cover 'modification' ... [in] conform[ance with] usage in other parts of the Act." 123 CONG. REC. 36,250, 36,253 (Nov. 1, 1977).

In sum, the 1977 amendments carved out a significant difference between existing sources on the one hand and new or modified sources on the other. The former faced no NSR obligations--in the common phrase, they were "grandfathered"--while the latter were subject to strict standards. Limiting NSR to new or modified sources was one method of accomplishing the amendments' goal of "a proper balance between environmental controls and economic growth," *id.* at 27,076 (Aug. 04, 1977) (statement of Rep. Waxman) (quoted in *Chevron U.S.A., Inc. v. Natural Res. Def. Council,* 467 U.S. 837, 852 n. 25, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984)).

EPA promulgated an NSR regulation in 1978. (Although at this time and later

13

ones, EPA issued multiple sets of regulations--those applying to PSD in states without approved SIPs, those applying to NNSR in states without approved SIPs, those applying to PSD in states with approved SIPs, and those applying to NNSR in states with approved SIPs--these sets are sufficiently similar that for simplicity we typically reference the first of these as a shorthand for them all.)  The 1978 regulation defined a major "modification" as a "physical change, change in the method of operation of, or addition to a stationary source which increases the potential emission rate of any air pollutant regulated under the act." 43 Fed.Reg. 26,380, 26,403-04 (June 19, 1978).  The phrase "potential emission rate," though new to EPA regulations relating to "modification," went unchallenged during ensuing litigation over other aspects of the 1978 regulation.  That litigation culminated in this circuit's *Alabama Power Co. v. Costle* decision, issued initially as a brief opinion, 606 F.2d 1068 (D.C.Cir.1979), that was superceded six months later by a much longer one, 636 F.2d 323 (D.C.Cir.1979).

In the period between the two *Alabama Power* opinions, EPA proposed a new NSR regulation.  The proposed definition of modification continued focusing on potential emissions rates rather than actual emissions.  44 Fed.Reg. 51,924, 51,952 (Sept. 5, 1979).  After the issuance of the revised *Alabama Power* opinion, however, EPA changed its definition of modification.  The final 1980 rule defined the term as follows:  " '[m]ajor modification' means any physical change in or change in the method of operation of a major stationary source that would result in a *significant net emissions increase* of any pollutant subject to regulation under the Act." 45 Fed.Reg. 52,676, 52,735 (Aug. 7, 1980) (emphasis added).  The regulation defined "[n]et emissions increase" as "any increase in actual emissions from a particular physical change or change in method of operation" that occurred after taking into account, through a process known as "netting," "any other increases and decreases in actual emissions at the source that are contemporaneous with the particular change and are otherwise creditable."  *Id.* at 52,736.  The regulation then defined "actual emissions" as follows:

> (ii) In general, actual emissions as of a particular date shall equal the average rate, in tons per year, at which the unit actually emitted the pollutant during a two-year period which proceeds the particular date and which is representative of normal source operation.  The Administrator shall allow the use of a different time period upon a determination that it is more representative of normal source operation.  Actual emissions shall be calculated using the unit's actual operating hours, production rates, and types of materials processed, stored, or combusted

during the selected time period.

(iii) The Administrator may presume that source-specific allowable emissions for the unit are equivalent to the actual emissions of the unit.

(iv) For any emissions unit which has not begun normal operations on the particular date, actual emissions shall equal the potential to emit of the unit on that date.

*Id.* at 52,737. In contrast to the proposed regulation's approach, this regulation emphasized "actual emissions." Justifying the shift, EPA explained in the regulation's preamble that while the initial *Alabama Power* decision had used the phrase "potential to emit," the later opinion used language that, "like the [statutory] definition, suggest[ed] changes in actual emissions," and that EPA had followed suit. *Id.* at 52,700. Finally, the 1980 regulation provided that "[a] physical change or change in the method of operation shall not include ... an increase in the hours of operation or in the production rate." *Id.* at 52,735-36.

Several parties petitioned this court for review of the 1980 rule, but we stayed that challenge because of ongoing settlement discussions with EPA. Ultimately, EPA and the parties entered into an agreement providing that the agency would undertake a new rulemaking and that if the new rule failed to meet certain conditions, the parties could revive their stayed petitions.

In the proceedings before us today, industry petitioners and EPA dispute what the 1980 rule meant. Both agree that for a source to undertake a modification, it must first make a physical or operational change other than an increase in the hours of operation. They disagree over how to measure an "increase" in emitted pollutants once a change has occurred. According to industry petitioners, the 1980 regulation provided that an emissions "increase" occurs only if the maximum hourly emissions rate goes up as a result of the physical or operational change. According to EPA, however, an increase occurs under the 1980 regulations if, after netting, a source's past annual emissions (typically measured by averaging out the two "baseline" years prior to the change) are less than future annual emissions (measured by calculating the source's potential to emit after the change). EPA proffered this interpretation, which quickly became known as the "actual-to-potential" test, in proceedings leading up to *Puerto Rican Cement Co. v. EPA,* 889 F.2d 292 (1st Cir.1989), and *Wisconsin Electric Power Co. v. Reilly,* 893

F.2d 901 (7th Cir.1990) ( "*WEPCo* ").  EPA also referred to this interpretation in its preambles to later rules, *see* 57 Fed.Reg. 32,314, 32,328 (July 21, 1992);  67 Fed.Reg. 80,186, 80,199 (Dec. 31, 2002).

*Puerto Rican Cement* 's facts illustrate the practical difference between industry's and EPA's interpretations.  In that case, a factory sought to make a physical change:  it would replace old cement kilns that operated 60% of the time with a new kiln that would emit fewer pollutants per hour.  "If operated to achieve about the same level of production [as the old ones], the new kiln will pollute far less than the older kilns;  but, if the Company operates the new kiln at significantly higher production levels, it will emit more pollutants than did the older kilns."  889 F.2d at 293.  Under the actual-to-potential test, the company "increased" its emissions after the change, making it subject to NSR:  operated at full potential, the new kiln would emit more pollutants than the old kilns had emitted when actually in operation. Under the interpretation urged by industry petitioners, however, the company had not undergone an "increase" in emissions--and thus would not trigger NSR-- since the new kiln would have a lower hourly emissions rate than the old ones. Siding with EPA, the First Circuit agreed that the company had to obtain an NSR permit to make the intended change.  *Id.* at 296-99.

*WEPCo*, which is important because of EPA's response to it, addressed whether EPA could apply the actual-to-potential test to utility plants undergoing extensive renovations.  The petitioner argued that given the particular nature of the utility market, it was unfair to compare a utility's past actual emissions with its future potential emissions.  Instead, the petitioner argued--and the Seventh Circuit agreed--that EPA should measure future emissions by projecting future actual emissions rather than by assuming, as it had done under the actual-to-potential test, that the source would operate at full capacity in the future.  893 F.2d at 916-18.

The Seventh Circuit decided *WEPCo* shortly before Congress enacted the 1990 amendments to the CAA. In those amendments, Congress added several programs-- distinct from NSR--aimed at further securing good air quality through regulating existing sources.  *See generally* Pub.L. No. 101-549, 104 Stat. 2399 (1990) (creating, among other things, programs aimed at reducing acid rain and at decreasing regional haze).  Though it also made some changes related to NSR, Congress ultimately neither addressed the issues raised in *WEPCo, see* H.R. CONF. REP. NO. 101-952, at 344-45 (1990), nor revisited its statutory definition of modification, instead leaving it up to EPA to respond to that decision.

EPA dealt with *WEPCo* by issuing a 1992 rule that changed the test utilities used for measuring emissions increases.  57 Fed.Reg. 32,314.  Under the new test, known as the "actual-to-projected-actual test," utilities would determine whether they had post-change increases in emissions--and thus whether they needed NSR permits--by comparing actual emissions before the change to their projections of actual post-change emissions.  *See id.* at 32,323-26.  In measuring projected emissions, EPA permitted utilities to exclude increases stemming from unrelated demand growth, reasoning that such increases would in no way be caused by physical or operational changes.  *See id.* at 32,326-28. The parties call this the "demand growth exclusion."  Applying the actual-to-projected-actual test and the demand growth exclusion to utilities only, EPA left the actual-to-potential test in place for other sources.

*NY v. US EPA, 413 F.3d 3, 11 -16.*

Noteworthy for the discussion here are two points from *NY v. US EPA*: first, neither the (utility)industry nor EPA ever sought, nor was the D.C. Circuit called upon to issue, a definitive decision on the 1980 rule and the controversy over the conflicting arguments over what constituted a (major) modification so as to trigger application of NSR and NSPS.  So far as the court can tell, industry and EPA peacefully co-existed to that limited degree.  Second, the D.C. Circuit, when it had an opportunity to do so, expressly declined to express an opinion

> " as to whether Congress intended to require that EPA use identical regulatory definitions of modification across the NSPS and NSR programs. *Cf. United States v. Duke Energy*, No. 04-1763, slip. op. at 11-19."[9]

413 F. 3d 3, 20.

---

[9]  Now 411 F.3d 539, 542 - 51 (4th Cir. 2005).

The lack of a decision from the D.C. Circuit on the 1980 rule is significant if for no other reason than that it has exclusive subject matter jurisdiction to determine the validity of EPA regulations with nationwide applicability, 42 U.S.C. §7607(b), and it could have, but didn't, reach the Fourth Circuit's interpretation of "modification"in *Duke Energy*, *supra*.[10] So, while the D.C. Circuit's pronouncement(s) on the 2003 EPA NSR rule are binding on this court, its ruling in *NY v. US EPA, supra*, did not dispose of the issues addressed here.  Lacking controlling precedent, the court is inclined to follow the most recent appellate interpretation of those rules as they apply to the definition of "modification", *U.S. v. Duke Energy, supra,* which held that the same definition applies to NSPS and NSR programs.  In *U.S. v. Alabama Power*, *supra*, this court noted that the emissions question has been answered differently by different courts, and ultimately adopted the *Duke Energy*'s District Court definition.[11]

---

[10]  The *NY v. EPA* court declined to do so on the grounds of procedural default, the issue not having been raised in the opening brief.  *Id*.  And, while the 1980 rule is no longer applicable except in cases, such as this one, that remain in litigation over the meaning of modification under the 1980 rule, and what test is used to monitor emissions increases under the 1980 rule, *see U.S. v. Alabama Power*, 372 F.Supp. 2d 1283 (N.D. Ala. 2005), the D.C. Circuit may not have wished to express, even in *dicta*, its views.

[11]  The Fourth Circuit found it unnecessary to reach the emissions question in *Duke Energy*.

### III. **TVA's COLBERT UNIT 5**

There is no dispute that Unit 5 of the Colbert plant was built before enactment of the new source provisions of the 1970 and 1977 CAA amendments, and falls under new source rules only if the unit underwent a "major modification." As already noted, NPCA says, and TVA denies, that the work done at Colbert Unit 5 in the early 1980s was a "major modification" that converted Colbert Unit 5 into a "new source."[12]

### IV. **STANDARD OF REVIEW**

Under Fed. R. Civ. P. 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." See Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Chapman v. AI Transport, 229 F.3d 1012, 1023 (11th Cir. 2000). The party asking for summary judgment always bears the initial responsibility

---

[12]   Newspaper articles submitted in support of its Motion quote TVA as saying the Colbert plant was poorly designed, out of service one-third (⅓) of the time, and the 1982 work was a "rehabilitation". Ex.'s 16, 17. The articles are submitted, together with Federal Register notices about the work and related bid documents, to show that ADEM, NPCA, and the rest of the world knew about the scope of the work  The inference asked to be drawn is that TVA actions in proceeding with the work without (NSR, NNSR, or PDS) permit(s) was legal because everyone knew and no one said or did anything.  This argument, if it ever had any persuasive weight, died on November 22, 2005 when the Court of Appeals trampled a similar argument used to defend the 2% de minimis rule. *Sierra Club v. TVA supra*.  Actually the *Sierra Club* argument was stronger, because ADEM had adopted the 2% de minimis rule and, as TVA's "friend", defended it in an *amicus curiae* filing with the Court of Appeals.  A lack of enforcement does not make legal what is illegal.  42 U.S.C. §110(a).  If there was ever any doubt before, in this Circuit it's now clear that it is better to ask permission than forgiveness.

of informing the court of the basis for its motion, and identifying those portions of the pleadings or filings which it believes demonstrate the absence of a genuine issue of material fact.  Celotex, 477 U.S. at 323.  Once the moving party has met its burden, Rule 56(e) requires the non-moving party to go beyond the pleadings and, by its own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial.  Celotex, 477 U.S. at 324.

The substantive law will identify which facts are material and which are irrelevant.  Chapman, 229 F.3d at 1023; Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  All reasonable doubts about the facts and all justifiable inferences are resolved in favor of the non-movant.  Chapman, 229 F.3d at 1023; Fitzpatrick v. City of Atlanta, 2 F.3d 1112, 1115 (11th Cir. 1993).  A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the non-moving party."  Anderson, 477 U.S. at 248;  Chapman, 229 F.3d at 1023.  If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted.  Anderson, 477 U.S. at 249.

The method used by the party moving for summary judgment to discharge its initial burden depends on whether that party bears the burden of proof on the issue at trial.  See Fitzpatrick, 2 F.3d at 1115-17 (citing U.S. v. Four Parcels of Real Property,

941 F.2d 1428 (11th Cir. 1991)(*en banc*)).  If the moving party bears the burden of proof at trial, then it can only meet its initial burden on summary judgment by coming forward with positive evidence demonstrating the absence of a genuine issue of material fact; i.e. facts that would entitle it to a directed verdict if not controverted at trial.  <u>Fitzpatrick</u>, 2 F.3d at 1115.  Once the moving party makes such a showing, the burden shifts to the non-moving party to produce significant, probative evidence demonstrating a genuine issue for trial.

If the moving party does not bear the burden of proof at trial, it can satisfy its initial burden on summary judgment in either of two ways.  First, the moving party may produce affirmative evidence negating a material fact, thus demonstrating that the non-moving party will be unable to prove its case at trial.  Once the moving party satisfies its burden using this method, the non-moving party must respond with positive evidence sufficient to resist a motion for directed verdict at trial.

The second method by which the moving party who does not bear the burden of proof at trial can satisfy its initial burden on summary judgment is to <u>affirmatively</u> show the absence of any evidence in the record in support of a judgment for the non-moving party on the issue in question.  This method requires more than a simple statement that the non-moving party cannot meet its burden at trial but does not require evidence negating the non-movant's claim; it simply requires the movant to point out

to the court that there is an absence of evidence to support the non-moving party's case.

Fitzpatrick, 2 F.3d at 1115-16.  If the movant meets its initial burden by using this

second method, the non-moving party may either point to evidence in the court record,

overlooked or ignored by the movant, sufficient to withstand a directed verdict, or the

non-moving party may come forward with additional evidence sufficient to withstand

a directed verdict motion at trial based on the alleged evidentiary deficiency.  However,

when responding, the non-movant can no longer rest on mere allegations, but must set

forth evidence of specific facts.  Lewis v. Casey, 518 U.S. 343 (1996) (citing Lujan v.

Defenders of Wildlife, 504 U.S. 555, 561 (1992)).

## V.  **The Disputed Issues**

The parties' disputes surrounding the statute of limitations defense are, with

some overlap, as follows:

1.    Whether the work was a discrete construction project or a
      combined construction/operating project, and, in either case,
      whether a permit should have been issued that required
      BACT or LAER.

2.    Whether the statute of limitations applies to NPCA's claim
      for injunctive relief and bars such relief pursuant to the
      concurrent remedy doctrine;

3.    Whether the NPCA's claims under the Alabama State
      Implementation Plan ("SIP"), which requires Best Available
      Control Technology ("BACT"), are not barred by the statute;
      and

22

4.      Whether laches applies to NPCA's claims.

## VI.  **Discussion**

1.      Whether the work was a discrete construction project or a combined construction/operating project, and, in either case, whether a permit should have been issued that required BACT or LAER.

3.      Whether the NPCA's claims under the Alabama State Implementation Plan ("SIP"), which requires Best Available Control Technology ("BACT"), are not barred by the statute of limitations.

Because the court 's decision on NPCA's first argument also applies to the NPCA's third argument, it will discuss them together.

Under the statute of limitations, a claim "first accrues" on the date that a violation first occurs.  *3M Co. v. Browner*, 17 F.3d 1453, 1462 (D.C. Cir. 1994). However, where a violation is ongoing, the statute of limitations is tolled for as long as the violation continues (the "continuing violations" doctrine).  *Haven Realty Corp. v. Coleman*, 455 U.S. 363, 380 (1982).

The majority of courts that have decided whether preconstruction permitting violations constitute "continuing violations" for statute  of limitation purposes have said they do not.  That is, "preconstruction permit violations occur *only* at the time of the construction or modification of the emitting facility."  *United States v. Westvaco Corp.*, 144 F. Supp. 2d at 443 (emphasis supplied).

In *New York v. Niagara Mohawk Power Corp.*, 263 F. Supp. 2d 650 (W.D.N.Y. 2003), the State of New York sued several utilities contending that life extension projects on their aging plants were "major modifications" that violated the law because the defendants had not first obtained PSD permits and installed BACT.[13]  Many of the projects occurred more than five years before the lawsuit was filed.  The state argued that the violations of the permitting requirements "constitute an ongoing and continuing violation."  *Id.* at 660.  The *Mohawk* court disagreed:

> A given construction or modification project occurs only once.  If a permit is not obtained for that particular project, then the preconstruction permit requirement of the Clean Air Act has been violated.  However, the requirement to secure a preconstruction permit applies *prior* to construction or modification.  Once the construction or modification is complete, the window in which to apply for and obtain a preconstruction permit is gone.  Thus, a violation of the Clean Air Act's preconstruction permit requirement is singular in nature, and does not constitute an ongoing violation.

*Id.* at 661 (emphasis in original); *see also id.* at 665 (holding that violation of obligation to install BACT is not a continuing violation).

TVA says, and the court agrees, that the failure to obtain a required preconstruction permit at Colbert 5 in 1982 or 1983 (when the work was completed, Gore Affidavit, Exhibit 7) was not a continuing violation, i.e. one that continues to the

---

[13]  The 1982 work at Colbert 5 was, at least, a life extension project.  *Compare* fn. 12, *supra*.

24

time suit was filed, and to this day.  To rule otherwise would be to say that construction work never ends.   The court says it must "distinguish[] between the present consequences of a one-time violation, which does not extend the limitation period, and a continuation of a violation into the present, which does." *Ross v. Buckeye Cellulose Corp.*, 980 F.2d 648, 658 (11th Cir. 1993); *see also Tolbert v. Ohio Dep't of Transp.*, 172 F.3d 934, 940 (6th Cir. 1999) ("'[A] continuing violation is occasioned by continual unlawful acts, not continual ill effects from an original violation.'") (*quoting Nat'l Adver. Co. v. City of Raleigh*, 947 F.2d 1158, 1166 (4th Cir. 1991)).

In addition to *Westvaco* and *Niagra Mohawk*, *supra*, other courts following the majority rule include *United States v. Ill. Power Co.*, 245 F. Supp. 2d at 957 (rejecting continuing violation doctrine--"these provisions cannot reasonably be construed to mean that building or altering a machine without a permit is a violation that continues as long as the machine exists or is operated"); *United States v. S. Ind. Gas & Elec. Co.*, 2002 WL 1760752, at *5 (concluding that violation "does not continue on past the date when construction is completed") (Ex. 27); *United States v. Murphy Oil USA, Inc.*, 143 F. Supp. 2d at 1084 (holding that statute of limitations "begins to run at the time of construction and does not continue through the operational life of the modified source"); *United States v. Coastal Lumber Co.*, Case No. 4:01-cv238-SPM (N.D. Fla. Dec. 23, 2001) (rejecting continuing violation doctrine) (Ex. 28); *United States v.*

*Brotech Corp.*, No. Civ. A. 00-2428, 2000 WL 1368023, at *2 (E.D. Pa. Sept. 19, 2000) (rejecting continuing violation argument) (Ex. 29); *United States v. Campbell Soup Co.*, No. CIV-S-95-1854 DFL, 1997 WL 258894, at *2 (E.D. Cal. 1997) ("[T]he regulation cannot reasonably be construed to mean that building or altering a machine without a permit is a violation that continues as long as the machine still exists or is operated.") (Ex. 30); *see also Satterfield v. J.M. Huber Corp.*, 888 F. Supp. 1561, 1564 (N.D. Ga. 1994) (rejecting continuing violation argument for purposes of CAA § 304(a)'s jurisdictional requirement: "The gravamen of Count I is that defendant failed to undergo the required review to receive a proper [PSD] permit.  A defendant can only fail to obtain a permit once.  This alleged violation is incapable of repetition because the plant's construction was completed years before the present suit was brought.").

TVA Ex. 7, Gore Decl., establishes that, at the time of the 1982 work at Colbert 5, Alabama had a construction permit program and not a combined construction / operating permit program.  Assuming the 1982 work *did* trigger provisions of the PSD or NNSR programs, TVA was required to obtain a construction permit before commencing construction.  NPCA's assertion that TVA had to obtain, either in 1982 or in 1985 when the Alabama ADEM emissions permitting process was changed, a "PSD operating permit" or an "NNSR operating permit," is rejected.[14]

---

[14]   As noted above, the work was completed in 1983.

26

NPCA urges the court to follow, as it did in *U.S. v. Alabama Power*, *supra*, the reasoning of *U.S. v. Duke Energy*, 278 F.Supp. 2d 619, 651 (M.D.N.C, 2005), on the continuing violation analysis.  In *Duke Energy* (in a part of the ruling not considered or adopted by this court in *Alabama Power),* the court held that Duke Energy's operations did constitute a continuing violation.  While it is true that the *Duke Energy* district court expressed doubt about the majority rule, the court did not say why it had such reservations.  Second, and much more important, Duke Energy's permits from North and South Carolina both contained **combined** construction / operation language. 278 F.Supp. 2d at 651 - 52.  If NPCA had materially disputed the Gore Declaration that, when the 1982 work was undertaken, Alabama's construction permit had an ongoing operating permit that TVA violated before, during, and subsequent to the 1982 work, then the reasoning of *Marine Shale* and *Duke Energy* (district court) would apply, and the result could well be different.[15]  NPCA has not done so.

Accordingly, NPCA's (First and Second Cause of Action) PSD and NNSR claims are time-barred, as to all claims relating to the 1982 and 1983 construction work at Colbert 5 because the cause of action accrued either in 1982 when the

---

[15]  This difference distinguishes the (non-binding) decision of the Fifth Circuit, *United States v. Marine Shale Processors*, 81 F.3d 1329 (5th Cir. 1996) (operating a facility without a required preconstruction permit is a continuing ongoing violation of the Act; Louisiana SIP required minor source permits be obtained prior to construction and required that the permit include subsequent operational restrictions on air emissions).  81 F.3d at 1355 -56.

preconstruction permit obligation was allegedly violated, or alternatively in 1983 when the work was completed.  In neither case did NPCA commence this action within five (5) years.

The above reasoning, and result, does not obtain with respect to TVA's **operation** of Colbert 5.  While NPCA ties the illegality of Colbert 5's operation to permitting failures, *Sierra Club  v. TVA*, ____ F.3d ____, Slip Opinion No. 04-15324, 2005 WL 3110516 (11th Cir., November 22, 2005) says that the entire Colbert County TVA plant, which includes Colbert 5, is in violation of the Act for failure to meet the 20% opacity requirement of the Act and the SIP.

In *Sierra Club v. TVA*, the Court of Appeals rejected ADEM's 2% de minimis rule as an end around the Act, and specifically the 20% opacity limitation contained in Alabama's EPA-approved SIP.  The Court stated that ADEM's 2% de minimis rule was not entitled to *Chevron*[16] deference because the 2% rule violated the Act and so could not be a reasonable interpretation of, or regulation issued under, the Act.  The Court pointedly noted that the 2% de minimis rule had not been submitted to EPA when it was first placed in use, had not been approved by EPA when ADEM, responding to Sierra Club's threat of litigation, did submit it, and, years later at the time of its

_____

[16]  *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 104 S. Ct. 2778 (1984), the leading case on deference paid by courts to federal and state administrative agency interpretations of the statutes administered under their jurisdiction.

opinion, still had not been approved.

Further, the Court rejected out of hand TVA's arguments, joined in by "its friend" Alabama that, because the use of COMS permitted stricter emissions monitoring than Method 9 (which in practice provided for almost no emissions monitoring), TVA needed the safe harbor provided by the 2% de minimis rule, or that, in the alternative, the 2% de minimis rule was a reasonable interpretation of the "credible evidence rule".[17]  The fact that industries might get away with more pollution than permitted  by the 20% opacity limitation because of ineffective enforcement was inconsequential to the Court, nor did it find any support for the argument that when EPA approved Alabama's SIP adoption of the "credible evidence" rule, EPA intended to modify "implicitly and downward the 20% opacity limitation". (Slip Op. at 24)  The Court said the Act provides for continuous compliance, 42 U.S.C. § 7602(k), and Alabama's "interpretation" of its SIP could not change the Act's mandate of continuous compliance.[18]  (Slip Op. at 24)

---

[17]  "Notwithstanding any other provision in [the ADEM regulations], any credible evidence or information relevant to whether a source would have been in compliance with applicable requirements if the appropriate performance or compliance test had been performed, can be used to establish whether or not an owner or operator has violated or is in violation of any rule or standard in this Division."  Ala. Admin. Code r. 335-3-1-.13(2).

[18]  The court said "By using an informal, non-public, undocumented 'interpretation' method of revising the SIP before 2003, ADEM short-circuited the important protections against uninformed and arbitrary rulemaking, and it attempted to avoid entirely EPA oversight of the SIP process".  Slip Opinion at 26.

To this court, after *Sierra Club v. TVA*, the NPCA arguments about why Colbert

5 is in violation of the Act are moot.  The Court of Appeals has said the entire plant is

in violation of the Act, and remanded the action to this court for appropriate

proceedings, which this court says includes declaratory and injunctive relief, and the

award of attorney's fees to the plaintiffs.  Unless and until the Eleventh Circuit's ruling

in *Sierra Club v. TVA* is modified, withdrawn, or overturned, this court does not have

to reach NPCA's SIP operating permit arguments.  Colbert 5, like the rest of the TVA

Colbert County plant, violates the Act every time a COMS reading exceeds twenty per

cent (20%) opacity, unless the reading falls into one of the four (4) exclusions.[19]

> 2.   Whether the statute of limitations applies to NPCA's claim
>      for injunctive relief and bars such relief pursuant to the
>      concurrent remedy doctrine;

The  source of the "concurrent remedy" rule is *Cope v. Anderson*, 331 U.S. 461,

464; 67 S. Ct. 1340, 1341, 91 L. Ed. 1602, 1607 (1947).  Basically, the concurrent

remedy doctrine says that where a party's legal remedies are time barred, that party may

not circumvent the bar by asserting equitable remedies.  The Eleventh Circuit affirmed

Judge Johnson's Order, entered February 20, 2003, that TVA, as an agency of the

---

[19] "At the time this lawsuit was filed, the Colbert plant was operating under permits ADEM had issued in March 1998.  One of the requirements of the Colbert plant's air permits is that TVA install, maintain, and operate a continuous opacity monitoring system ("COMS") in each of the plant's smokestacks.  See Ala. Admin. Code r. 335-3-12-.02(3).  As its name indicates, COMS is a device that monitors continuously the opacity of a plume of smoke." *Sierra Club v. TVA*, *supra*, Slip Opinion at 5.

United States, is entitled to sovereign immunity from civil penalties, *Sierra Club v. TVA, supra*.  TVA is immune from civil penalties, and the question becomes whether NPCA can obtain injunctive relief or whether that relief is barred as a concurrent remedy.  The court says NPCA can do so: the Eleventh Circuit's ruling in *Sierra Club v. TVA*, *supra*, reversed this court's grant of summary judgment in favor of TVA "on the remaining claims for declaratory and injunctive relief", and remanded for proceedings consistent with its opinion.

The court anticipates TVA will says the Eleventh Circuit's ruling doesn't end the inquiry because *Sierra Club v. TVA* did not reach the concurrent remedy question. There, civil penalties were barred under the doctrine of sovereign immunity, not the running of the statute of limitations.[20]  And there is authority that it remains the law of this Circuit that where legal and equitable relief are sought, and the legal relief is barred by the running of the statute of limitations, the concurrent remedy doctrine will be applied to bar the equitable relief as well.  *United Transp. Union v. Fla. East Coast Ry. Co.*, 586 F.2d 520, 523-24 (5th Cir. 1978).[21]

---

[20]   The doctrine does not bar enforcement actions brought by the United States in its sovereign capacity. *E.I. Dupont de Nemours & Co. v. Davis*, 264 U.S. 456, 462 (1924); *United States v. Alvarado*, 5 F.3d 1425, 1425 (11th Cir. 1993).

[21]   In *Bonner v. City of Prichard*, 661 F.2d 1209 (11th Cir. 1981), the Eleventh Circuit adopted as binding precedent all decisions rendered by the former Fifth Circuit prior to October 1, 1981.

NPCA cites *U.S. v. Banks*, 115 F.3d 916 (11th Cir. 1997) as support for the inapplicability of the concurrent remedy.  *Banks* said so, but only as against the United States acting in its sovereign capacity.  *Id*. at 319.  Citizen suits are not the same. Congress enacted the citizen suit provision of the CAA to authorize citizens to act as "private attorneys general", *see Middlesex County Sewerage Authority v. National Sea Clammers Ass'n*, 453 U.S. 1, 17, 101 S.Ct. 2615, 2624 (1980).  42 U.S.C. § 7604, the citizen suit provisions, authorizes suit by a citizen "on his own behalf".  "On his own behalf" establishes that a citizen plaintiff, while a "private attorney general," nevertheless does not, merely by virtue of filing suit under the statute in question, represent the public at large in the same sense that a state attorney general or the Department of Justice does when it brings an enforcement action.  *See Natural Resources Defense Council v. Train*, 510 F.2d 692, 723-30 (D.C. Cir. 1974).

As an alternative argument, NPCA, in a recent filing (doc. 207), cites language in the November 5, 2005, Order entered by the United States District Court for the Southern Division of Indiana, *United States v. Cinergy Corp*., 99-1693-LJM-VSS (document 647) ("*Cinergy*") for the proposition that civil fines and equitable remedies are not concurrent because they have "different goals and effects".  *Cinergy* Order at p.

10.[22]

The court is not persuaded.  First, as TVA notes, the language is *dicta*, because the United States is a party in *Cinergy*.  Second, the court does not know what "different goals and effects" means, and thinks adopting that standard would permit a court to reach the result desired by reference to the required "goals and effects".  By contrast, the distinction between "legal" and "equitable" remedies is long standing and there is widespread agreement on the basic distinction, *i.e.* that a plaintiff's claims that can be satisfied by an award of money damages are "legal" and claims that cannot be satisfied by such an award, or which call for non-monetary relief, are "equitable".  Adding to the appeal of maintaining this distinction is the ability to "borrow" from case law in other statutes, e.g. ERISA, where the "legal" vs. "equitable" analysis is used, *i.e., Mertens v. Hewitt*, 113 S.Ct. 2063, 508 U.S. 248, 12 L.Ed.2d 161 (1993) (ERISA plan seeks to recover from nonfiduciaries participating in fiduciary's breaches; action is not "appropriate equitable relief" and statute does not authorize suits for money damages), and *Great-West Life v. Knudson*, 122 S.Ct. 708, 534 U.S. 204, 151 L.Ed.2d 615 (2002). (ERISA plan seeks to recover from third parties benefits paid by the plan(s) to plan members/plan beneficiaries; courts are required to decide whether, under the facts

---

[22] In that same opinion, at pages 6 - 7, the *Cinergy* court dismissed as time barred a number of construction projects, rejecting the "continuing violation" doctrine.

presented, the claim is for the equitable remedy of restitution (recovery allowed) or for "legal" money damages (claim disallowed)). This court can't find authority or guidance in the CAA for a logical application of the "different goals and effects" analysis of "legal" versus "equitable" claims, and declines to follow *Cinergy*.

Having said all that, this is an issue that, post-*Sierra Club v. TVA*, is probably going to be found irrelevant. Assuming the mandate issues in accordance with the Court's opinion, *Sierra Club v. TVA* will involve injunctive relief, and since that relief will be plant-wide, it will necessarily include Colbert 5.

4.    Whether laches applies to NPCA's claims

In light of *Sierra Club v. TVA, supra*, and the treatment of the statute of limitations herein, the court finds it unnecessary to reach the issue of laches. While laches may arise as a defense to NPCA's Third Cause of Action[23], that claim is not before the court in this motion.

---

[23]  NPCA's Third Cause of Action, ¶¶ 1 - 91, "The NSPS Violations", says that the work at Colbert 5 constituted a "modification" as defined in 42 U.S.C. § 7411(a)(2), transforming Colbert 5 to a "new source" of emissions subject to the New Source Performance Standards ("NSPS"). NPCA says Colbert 5 has failed to meet the applicable NSPS notification, performance testing, monitoring and reporting requirements, and continues to operate in violation thereof, including *inter alia*, the failure to install a Continuous Monitoring System ("COMS") for Colbert 5 as required by 40 C.F.R. Part 60, Appendix B, 40 C.F.R. §§ 60.13 and 60.47.

VII.  **Consolidation Of This Action With**
       ***SIERRA CLUB v. TVA***

*Sierra Club v. TVA, supra*, involves two (2) of the three (3) parties in this action,

Sierra Club and TVA.  This action involves Unit No. 5 of TVA's Colbert County plant;

*Sierra Club v. TVA* involves the entire plant.  Both actions are assigned to this Judge.

Both actions seeks declaratory and injunctive relief, and in neither case will the

Plaintiffs be able to recover civil penalties against TVA.  In this action, NPCA alleges

TVA's failure to install COMS in Colbert 5 violates the Clean Air Act; *Sierra Club v.*

*TVA* says

> TVA's ADEM-issued air permits reflect these regulatory requirements:
> TVA must install COMS to measure opacity and include "average and
> maximum excess emissions over 20% [opacity] computed from six-minute
> averages" in quarterly reports to ADEM.  ADEM Permit No. 701-0010-
> Z009 at 3.

Slip Opinion, fnote 4 at pp. 24 - 25.

In short, this action and *Sierra Club v. TVA* have substantial identity of claims and

remedies, and the court will, when the mandate is received, consolidate *Sierra Club v.*

*TVA* with this action.

For the reasons stated, TVA's Motion For Partial Summary Judgment on the First

and Second Causes of Action based on the running of the Statute of Limitations will be

construed as a motion for summary judgment on the grounds of sovereign immunity and

the running of the statute of limitations, and, construed as such, GRANTED in part and

DENIED in part.

A separate Order will issue.

Done on November 29th, 2005.

**VIRGINIA EMERSON HOPKINS**
United States District Judge