FILED

2005 Dec-21  PM 04:04
U.S. DISTRICT COURT
N.D. OF ALABAMA

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
### Northwestern Division

| | | |
|---|---|---|
| NATIONAL PARKS CONSERVATION ASSOCIATION, INC., and | ) ) ) | |
| | ) | |
| SIERRA CLUB, INC., | ) | |
| | ) | |
| **Plaintiffs** | ) | |
| | ) | |
| v. | ) | **Civil Action No.-01-403-VEH** |
| | ) | |
| TENNESSEE VALLEY AUTHORITY | ) ) | |
| | ) | |
| **Defendant.** | ) | |

---

## MEMORANDUM OPINION ON TENNESSEE VALLEY AUTHORITY MOTION TO DISMISS THIRD CAUSE OF ACTION
### (Failure To Comply With Statutory Notice Requirements)

Plaintiffs National Parks Conservation Association, Inc. ("NPCA") and Sierra Club, Inc. ("Sierra Club") have filed an action under the citizen suit provision of the Clean Air Act ("CAA" "the Act"), 42 U.S.C. § 7604(a) (2000) asserting Tennessee Valley Authority ("TVA") violated the CAA by its 1982 work at the Colbert Unit 5 plant ("the work"). NPCA[1] says the work constituted a "modification" under the CAA, triggering the New Performance Standards ("NSPS"), Non-Attainment NSR

---

[1] For economy's sake, "NPCA" shall mean "NPCA and Sierra Club" unless the context clearly indicates otherwise.

("NNSR")[2], and Prevention of Significant Deterioration ("PSD") standards of the CAA.  Second Amended Complaint ("SAC").  (Doc. 80.)

## I. ISSUE PRESENTED

In its Third Cause of Action, NPCA alleges TVA, at Colbert No. 5, has violated the New Source Performance Standards ("NSPS") of the CAA on a daily basis for close to twenty (20) years.

TVA has moved to dismiss NPCA's Third Cause of Action for failure to comply with the pre-suit notification requirement applicable to citizen suits under the CAA.  42 U.S.C. § 7604(b).  Because TVA has filed exhibits in support of its Motion to Dismiss, the TVA motion will be also treated as a motion for summary judgment. After a review of the CAA, and discussion of citizen suits in the CAA and other statutes, the NPCA 60-day notice letter is reviewed and the legal issues raised by it are discussed.  For the reasons stated in that review and discussion, I find the NPCA Notice letter is insufficient to give TVA the adequate notice required by the Act, requiring the Third Cause of Action to be dismissed.

---

[2] The EPA has designated the counties around the Colbert Plant as meeting the NAAQS, *see* Plaintiffs' Memorandum in support of Motion for Partial Summary Judgment (standing), page 13, fn. 3.  (Doc. 177.)

## II. **THE CLEAN AIR ACT**

The Clean Air Act is codified at 42 U.S.C. §§ 7401-767 (2000). The

implementing regulations are found at 40 C.F.R., pts. 50-99. The original Act and the

amending legislation can be found, respectively, at Clean Air Act Amendment of

1970, Pub. L. No. 91-604, 84 Stat. 1676 (1970); Clean Air Act Amendments of 1977,

Pub. L. 95-95, 91 Stat. 685 (1977); Clean Air Act Amendments of 1990, Pub. L. No.

101-549, 108 Stat. 2399 (1990).

"New source review" denotes a series of provisions within the federal Clean Air Act (Act). Congress enacted the Clean Air Act in 1970, with major amendments occurring in 1977 and 1990. The Act represents one of the federal government's earliest efforts to protect the environment through a comprehensive regulatory scheme.

The Clean Air Act requires the Environmental Protection Agency to establish baseline "national ambient air quality standards" (NAAQS), setting maximum permissible concentrations for "criteria" pollutants. The Act divides the United States into two types of regions: those that are currently in compliance with all of the NAAQS standards ("attainment areas"), and those that are violating some or all of these standards ("non-attainment areas"). The Act establishes different emissions requirements for facilities in each region, with stricter standards applicable to facilities in non-attainment areas.

The 1977 Amendments to the Clean Air Act incorporated the new source review provisions. These provisions were designed to ensure that large industrial sources of air pollution included modern pollution-control equipment when they altered their facilities. New source review mandated that the "best" emissions-control technology be installed whenever a "major" source was built, replaced, or modified (creating, in NSR terminology, a "new source" of air pollution). NSR provides an exception to this best-technology requirement for some "routine maintenance" to major sources.

3

What qualifies as the "best" technology in turn depends on the ambient air quality in the surrounding region. Facilities seeking to build or modify equipment in attainment areas are subjected to "prevention of significant deterioration" (PSD) review.    To proceed with their proposed projects, facilities must determine whether new or increased emissions resulting from these projects would cause the area to exceed ambient air quality standards or to suffer a "significant" deterioration in air quality.    PSD review requires that any new source adhere to the "best available control technology" (BACT) standard, governing emissions of regulated pollutants.    BACT, a source-specific standard, is generally understood to require the best pollution-control technology available, after taking into account energy, economic and environmental considerations.

Facilities seeking to build or modify structures in NAAQS non-attainment areas are subject to more stringent requirements. These facilities must obtain pre-construction permits, certifying that pollution from any new source will not hinder the region's progress towards attainment of the NAAQS standards. New sources must install emissions-control equipment that meets the stringent "lowest achievable emissions rate" (LAER) standards.    LAER standards are generally stricter than BACT standards, because they are set without any consideration of energy or economic factors.    Facilities seeking to add sources in non-attainment areas must show, furthermore, that they plan to "offset" any projected emissions increases from these new or modified sources with emissions decreases in other areas of the same facility or from other facilities in the non-attainment area.

Martin, The Reform of New Source Review: Toward A More Balanced Approach, 23 Stan. Envtl. L.J. 351, 356-58 (2004) (citations omitted)

The Act establishes a program of "cooperative federalism" with a "division of labor between individual states and EPA" for the attainment and maintenance of national air quality goals. *Sierra Club v. EPA*, 315 F.3d 1295, 1300 (11th Cir. 2002). EPA's responsibility is to set air quality standards.  For pollutants meeting certain

criteria, EPA is responsible for promulgating national ambient (i.e., outdoor) air quality standards ("NAAQS"). 42 U.S.C. § 7409(a) (2000). These standards must be sufficient to protect the public health (with an adequate margin of safety) and the public welfare (including effects on soils, water, vegetation, manmade materials, animals, visibility, etc.) from any known or anticipated adverse effects. 42 U.S.C. §§ 7409(b)(1) & (2) (2000); 42 U.S.C. § 7602(h) (2000). In turn, a state, to achieve national air quality standards, adopts an air quality plan known as a State Implementation Plan ("SIP") that controls emissions from specific sources. 42 U.S.C. § 7410.

Both the CAA and the SIPs enacted by states regulate new and existing major stationary sources of air pollution differently. In general, *new* sources – i.e., sources constructed or "modified" after the effective date of the applicable statute or implementing regulation – must undergo preconstruction review and permitting and, as part of this permitting process, are required to install emission controls capable of meeting specified emission rates. The thinking at the time Congress chose to impose these obligations on new sources was that, as old plants were retired and new power plants built, the new plants or sources could incorporate these more stringent emissions controls into their design and construction more cost-effectively and efficiently than existing sources. *See, e.g.,* H.R. Rep. No. 95-294, 95th Cong., 1st

5

Sess., at 185, *reprinted in* 1977 U.S.C.C.A.N. 1077, 1264 (1977).[3]

There are three (3) separate new source programs under the CAA. The oldest

of these is the federal New Source Performance Standards program (NSPS) enacted

in 1970, 42 U.S.C. § 7411. The other two new source programs – Nonattainment New

Source Review (NNSR) and Prevention of Significant Deterioration (PSD) – were

enacted in 1977 and are companion programs that apply on a pollutant-by-pollutant

basis depending on whether the source is located in an attainment area (PSD) or a

nonattainment area (NNSR) for that pollutant. *See generally, TVA v. Whitman*, 336

F.3d 1236, 1244 nn.12-14 (11th Cir. 2003); *United States v. Duke Energy Corp.*, 278

F. Supp. 2d 619, 627-30 (M.D.N.C. 2003). The requirements of the Alabama PSD and

NNSR provisions are triggered when a new source is built or when an existing major

stationary source constructs a "major modification." *See* AAPCC Regulations 16.4.8

(Ex. 5 at 10) & 16.3.2(c) (Ex. 6 at 16-8). If triggered, these new source requirements

require installation of pollution control equipment that represents best available

_____

[3] Congress' reasoning was sound, the consequences most likely unintended. For a number of reasons, ranging from decreased demand for electricity, energy prices that were considerably lower than projected at the time (1970), to local opposition ("not in my back yard" or "NIMBY" litigation), and increased construction costs, there were very few new power plants built in the decades after enactment of the CAA, and the industry instead "stretched" the life expectancy of its facilities through "life extension" projects. This in turn led to litigation over what work at a given plant makes that plant or unit a "new source" and what work falls under the "routine maintenance and repair" exception and is therefore exempt from NSR/NNSR/PSD requirement and permitting. This tension is seen most recently in response to a series of 1999 enforcement actions filed by the EPA in the waning days of the second Clinton administration.

control technology (BACT) (under the PSD program) or lowest achievable emission rate (LAER) (under the NNSR program).

*Existing* sources, by contrast, fall under other provisions of the Act. Existing sources are not required to install emission controls such as BACT or LAER unless, among other things, work performed there is a "major modification" as discussed above. The court does not understand NPCA to allege TVA has violated these provisions with respect to Colbert 5 except to the extent describe above, i.e., the failure to obtain the permits NPCA says were required by the work.[4] These include the emissions limitations and other requirements established by the states in their SIPs to achieve EPA's NAAQS, hazardous air pollutant standards, visibility protection programs, and acid rain control programs. 42 U.S.C. §§ 7410, 7412, 7491, 7492 & 7651-7651o (2000). TVA says, and NPCA agrees, that the area around the entire Colbert plan is in attainment of all national air quality standards and has been in attainment since the early 1990's.

For further court discussions of the conflicts in CAA emissions enforcement, *compare, e.g., United States v. Ohio Edison*, 276 F.Supp. 2d 829 (S.D. Ohio 2003), with *United States v. Duke Energy Corp.*, 278 F.Supp. 2d 619 (M.D.N.C. 2003); and

---

[4] As described *infra*, certain plants were, because of their age, "grandfathered". Colbert 5 is part of one such plant.

7

*Wisconsin Electric Power Co. v. Reilly*, 893 F.2d 901 (7th Cir. 1990) (*"WEPCO"*), with *U.S. v. Duke Energy*, 411 F.3d 539 (4th Cir. 2005). For the current state of emissions rules, and a comprehensive history of the various EPA emission rules and the litigation over those rules, *see NY v. U.S. EPA*, 413 F.3d 3 (D.C. Cir. 2005).

Turning to the interplay of the emissions limitations of the Clean Air Act, the emissions regulations promulgated thereunder by Alabama's Department of Environment Management ("ADEM"), and the effect of Alabama's CAA State Implementation Plan (SIP) on those regulations, reference is made to the Eleventh Circuit's November 22, 2005 decision in *Sierra Club v. TVA*, ____ F.3d ____,Slip Opinion No. 04-15324, 2005 WL 3110516 (11th Cir., November 22, 2005), where the Court of Appeals, in an action also involving TVA's Colbert plant, affirmed in part, reversed in part, and remanded this Court's September 14, 2004 Memorandum Opinion and Order in *Sierra Club v. TVA*, No. CV-02-2279-VEH (TVA Ex. 31). (*Inter alia*, Alabama's ADEM 2% de minimis emissions rule violates the Act, and was never approved by the EPA and therefore never became part of Alabama's SIP). More on *Sierra Club v. TVA* later.[5]

Earlier this year, prior to the Eleventh Circuit's opinion in *Sierra Club v. TVA,*

---

[5] Alabama's PSD program has also been recently reviewed by this court, *United States v. Alabama Power Co.*, 372 F.Supp. 2d 1283 (N.D. Ala. 2005). Alabama's NNSR program is similar.

8

*supra*, the D.C. Circuit rejected in part and sustained in part numerous challenges to the latest EPA emission rule ("the 2002 rules"). *NY v. U.S. EPA*, 413 F.3d 3 (D.C. Cir. 2005)

## III. **TVA's COLBERT UNIT 5**

There is no dispute that Unit 5 of the Colbert plant was built before enactment of the new source provisions of the 1970 and 1977 CAA amendments, and falls under new source rules only if the unit underwent a "major modification." As already noted, NPCA says, and TVA denies, that the work done at Colbert Unit 5 in the early 1980s was a "major modification" that converted Colbert Unit 5 into a "new source."[6]

## IV. **STANDARD OF REVIEW**

Under Fed. R. Civ. P. 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Chapman v. AI Transport*, 229 F.3d 1012, 1023 (11th Cir. 2000). The party asking for summary judgment always bears the initial

---

[6] As noted in the court's Order on TVA Motion to Dismiss First and Second Causes of Action (Statute of Limitations), newspaper articles submitted in support of that Motion quote TVA as saying the Colbert plant was poorly designed, out of service one-third ($\frac{1}{3}$) of the time, and the 1982 work was a "rehabilitation". TVA Ex.'s 16, 17 in support thereof.

9

responsibility of informing the court of the basis for its motion, and identifying those portions of the pleadings or filings which it believes demonstrate the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323. Once the moving party has met its burden, Rule 56(e) requires the non-moving party to go beyond the pleadings and, by its own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial. *Celotex*, 477 U.S. at 324.

The substantive law will identify which facts are material and which are irrelevant. *Chapman*, 229 F.3d at 1023; *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). All reasonable doubts about the facts and all justifiable inferences are resolved in favor of the non-movant. *Chapman*, 229 F.3d at 1023; *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson*, 477 U.S. at 248; *Chapman*, 229 F.3d at 1023. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted. Anderson, 477 U.S. at 249.

The method used by the party moving for summary judgment to discharge its initial burden depends on whether that party bears the burden of proof on the issue at trial. *See Fitzpatrick*, 2 F.3d at 1115-17 (citing *U.S. v. Four Parcels of Real Property*,

10

941 F.2d 1428 (11th Cir. 1991) (*en banc*)). If the moving party bears the burden of proof at trial, then it can only meet its initial burden on summary judgment by coming forward with positive evidence demonstrating the absence of a genuine issue of material fact; i.e. facts that would entitle it to a directed verdict if not controverted at trial. *Fitzpatrick*, 2 F.3d at 1115. Once the moving party makes such a showing, the burden shifts to the non-moving party to produce significant, probative evidence demonstrating a genuine issue for trial.

If the moving party does not bear the burden of proof at trial, it can satisfy its initial burden on summary judgment in either of two ways. First, the moving party may produce affirmative evidence negating a material fact, thus demonstrating that the non-moving party will be unable to prove its case at trial. Once the moving party satisfies its burden using this method, the non-moving party must respond with positive evidence sufficient to resist a motion for directed verdict at trial.

The second method by which the moving party who does not bear the burden of proof at trial can satisfy its initial burden on summary judgment is to affirmatively show the absence of any evidence in the record in support of a judgment for the non-moving party on the issue in question. This method requires more than a simple statement that the non-moving party cannot meet its burden at trial but does not require evidence negating the non-movant's claim; it simply requires the movant to

11

point out to the court that there is an absence of evidence to support the non-moving party's case. *Fitzpatrick*, 2 F.3d at 1115-16. If the movant meets its initial burden by using this second method, the non-moving party may either point to evidence in the court record, overlooked or ignored by the movant, sufficient to withstand a directed verdict, or the non-moving party may come forward with additional evidence sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency. However, when responding, the non-movant can no longer rest on mere allegations, but must set forth evidence of specific facts. *Lewis v. Casey*, 518 U.S. 343 (1996) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992)).

## V.  **CITIZEN SUITS UNDER THE CLEAN AIR ACT**

A.  Notice Provisions Generally

Almost every major environmental law today has a provision allowing for suits brought by the public to enforce the terms of the statute.[7] The provisions are called citizen suit provisions, and they are designed to have several effects.   As the name implies, these provisions are intended to allow for greater citizen participation in the enforcement of environmental laws.   *See, Hallstrom v. Tillamook County,* 493 U.S.

_____

[7] *See, e.g.,* the Federal Water Pollution Control Act (the Clean Water Act), 33 U.S.C. § 1365; the Resource Conservation and Recovery Act (RCRA), 42 U.S.C. § 7002;  and the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA), 42 U.S.C. § 9659.   In fact, the only major environmental statute without a citizen suit provision is the Federal Insecticide, Fungicide and Rodenticide Act (FIFRA), 7 U.S.C. § 136 *et seq.*

20, 28, 110 S.Ct. 304, 309, 107 L.Ed.2d 237 (1989).   Additionally, because these

provisions generally, and the CAA specifically, allow for a lawsuit against the EPA

Administrator for failing to fulfill his statutory duty, the provisions are intended to

encourage statutory administrators and enforcers to fulfill those functions.  *Id.* at 29,

110 S.Ct. at 310.

The Clean Air Act was the first piece of environmental legislation to contain a

citizen suit provision, and was the basis for all notice provisions that were included

in subsequent environmental statutes.[8]  *Id.* at 28, 110 S.Ct. at 309.

B. Notice under the CAA

The notice provision of the CAA, 42 U.S.C. § 7604(a), says:

> **(a) Authority to bring civil suit, jurisdiction**
>
> Except as provided in subsection (b) of this section, any
> person may commence a civil action on his own behalf-
>
> (1) against any person ... who is alleged to have violated ...
> or to be in violation of ... an emission standard or limitation
> under this chapter ...

Although Congress clearly wanted to encourage citizen participation, there was

---

[8] For this reason courts will often rely on case law interpreting the citizen suit provision
of one particular statute in their interpretation of a different statute.   The citizen suit provisions
are essentially interchangeable.  *See, Hallstrom v. Tillamook County,* 831 F.2d 889, 890 (9th
Cir.1987) ("Courts have construed [the notice provisions in different environmental statutes]
identically ..."), *aff'd* 493 U.S. 20, 110 S.Ct. 304, 107 L.Ed.2d 237 (1989).

13

an important and contrary concern that was also addressed in the legislation.
*Hallstrom, supra*, at 29, 110 S.Ct. at 310. In order to prevent a tidal wave of citizen
suits burdening government agencies as well as the federal courts, Congress included
a requirement that citizens notify the alleged polluter, the state in which the alleged
violation occurred, and the Administrator 60 days prior to bringing suit. 42 U.S.C. §
7604(b). This requirement has several effects. First, it allows the appropriate agency
to undertake enforcement action in the interim. *Hallstrom,* 493 U.S. at 29, 110 S.Ct.
at 310. Additionally, the notice requirement provides a delay period in which the
alleged violator can take steps in order to bring itself into compliance. *Id.; see also,*
*Gwaltney of Smithfield v. Chesapeake Bay Foundation,* 484 U.S. 49, 60, 108 S.Ct.
376, 382, 98 L.Ed.2d 306 (1987).

Subsection (b) sets forth the notice requirement for citizen suits brought under
the Clean Air Act. According to that subsection:

> **(b) Notice**
>
> No action may be commenced-
>
> (1) under subsection (a)(1) of this section-
>
> (A) Prior to 60 days after the plaintiff has given notice of
> the violation (i) to the Administrator, (ii) to the State in
> which the violation occurs, and (iii) to any alleged violator
> of the standard ...
> except that such action may be brought immediately after

14

> such notification in the case of an action under this section
> respecting a violation of section 7412(i)(3)(A) or (f)(4) of
> this title or an order issued by the Administrator pursuant to
> section 7413(a) of this title.   Notice under this subsection
> shall be given in such manner as the Administrator shall
> prescribe by regulation.

42 U.S.C. § 7604(b).

In 1989, the Supreme Court resolved a split in the circuits regarding the interpretation of the notice requirement found in environmental statutes. *Hallstrom,* 493 U.S. 20, 110 S.Ct. 304, 107 L.Ed.2d 237.   Interpreting the notice provision in the RCRA (42 U.S.C. § 7002), the Court held that notice is a prerequisite to a citizen suit, although the court specifically stopped short of holding that giving notice is actually jurisdictional. *Id.* at 31, 110 S.Ct. at 311.[9]  Thus, based on *Hallstrom,* a citizen suit ordinarily may not be maintained unless the plaintiff provides the alleged violator, the State in which the violation occurred, and the Federal Government (the EPA Administrator) with notice of an intent to sue at least 60 days prior to filing the complaint.

As shown by the language of 42 U.S.C. § 7604(b) set out above, though, there are two exceptions to the 60-day notice requirement of the Clean Air Act.   These are for suits brought for violations of section 7412(f)(4) and section 7412(i)(3)(A). NPCA

---

[9] Other courts have done so, VII.A., *infra.*

15

does not allege this action falls under either provision.[10]

Until the 1990 Amendments to the Act, citizen suits were only permitted when the alleged violations continued till the date the action was filed. The rule barring wholly past violations was based on the Supreme Court's holding in *Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Foundation,* 484 U.S. 49, 57, 108 S.Ct. 376, 381, 98 L.Ed.2d 306 (1987), interpreting the Clean Water Act's then-similar citizen suit provision. In 1990, the CAA was amended to permit citizen suits against any person "alleged to have violated (if there is evidence that the alleged violation has been repeated) or to be in violation" (of the Act), 42 U.S.C. § 7604(a).[11] A plain reading of the CAA, as amended, indicates that the 1990 Amendments overruled *Gwaltney* with respect to wholly past violations. The CAA, therefore, permits citizen suits, like this one, for both continuing violations and wholly past violations, so long as the past violation occurred more than once. This interpretation has been accepted by several courts. *Atlantic States Legal Found. v. United Musical Instrs.,* 61 F.3d 473, 477 (6th Cir.1995) (in dicta: Congress passed 1990 Amendments "explicitly to allow citizen suits for purely historical violations"); *Glazer v. American Ecology Env. Servs. Corp.,* 894 F.Supp. 1029, 1037 (E.D.Tex.1995) ("The 1990 amendments to the CAA add a

---

[10] See, e.g. *Adair v. Troy State Univ.,* 892 F.Supp. 1401 (M.D. Ala. 1995) (asbestos released during remodeling of a university building).

[11] The original language only permitted suits against those "alleged to be in violation."

basis for citizen suit jurisdiction");  *Adair v. Troy State Univ., supra* at 1409 (1990

Amendment "clearly includes past violations, so long as there is evidence that the

violations were repeated"); *Atlantic States Legal Foundation, Inc. v. Whiting Roll-Up*

*Door Mfg. Co.,* 772 F.Supp. 745 (W.D.N.Y.1991) (same, in dicta). *See also* Daniel

Riesel, *Citizen Suits and the Award of Attorneys' Fees in Environmental Litigation,*

C921 ALI-ABA 1073, 1126 (1994) (1990 Amendments "effectively reversed the

holding in *Gwaltney*"); Hon. Henry A. Waxman, *An Overview of the Clean Air Act*

*Amendments of 1990,* 21 Envt.L. 1721, 1748 (1991) ("the 1990 Amendments for the

first time explicitly provide that citizens can seek civil fines for both past and current

violations of the CAA"); David T. Buente, *Citizen Suits and the Clean Air Act*

*Amendments of 1990: Closing the Enforcement Loop,* 21 Envt.L. 2233, 2238 (1991)

("Congress partially overruled the Supreme Court's *Gwaltney* decision."). *See, e.g.,*

*Fried v. Sungard Recovery Services, Inc.* 916 F.Supp. 465, 467-68 (E.D.Pa. 1996).[12]

## VI. **NPCA's NOTICE LETTER**

The NPCA October 30, 2000 Notice Letter ("NPCA letter"; "Notice letter"),

Exhibit 1 to TVA's Brief in Support of Motion to Dismiss, alleges violations of the

CAA at ten (10) different TVA coal-fired electricity generating plants in Tennessee,

---

[12] Of course, claims for past violations must still be timely, i.e. fall within the statute of limitations.  Earlier, the court dismissed as time barred NPCA claims relating to TVA's alleged failure to obtain required PSD and NSR permits for the 1982/1983 work at Colbert No.5.

Alabama, and Kentucky. NPCA's Notice letter for the Third Cause of Action involves

Colbert No. 5.

The Notice letter's first three (3) pages notify TVA of NPCA's intent to sue,

identifies the ten plants, describes in a summary fashion the citizen suit provisions of

the Act, and then provides background for the PSD/NSR violations. Much of that

background has already been described earlier in this Opinion, and will not be

repeated.

The specific violations alleged are summarized:

> Page 7, No. 8 - TVA has been in violation of the Act "every day after
> making numerous unpermitted modifications at Colbert Unit 5". The
> work was a major modification as defined in the Alabama SIP, and
> performed without a required PSD or NSR permit. "Further, since 1990
> you have operated this unit without a PSD or NSR permit". TVA was
> required to use install BACT and LAER and, by continuing to operate
> without such permits, violate(ed)(s) the Act. Also alleged is a violation
> of the Alabama minor source construction permit rule.
>
> Page 9, Section II - Colbert Unit 5 violated NSPS. NPCA says it did so
> because the work at Colbert 5 caused an increase in the maximum hourly
> emissions rate and therefore was a "modification". Accordingly Colbert
> 5 was "... required to meet all of the requirements of Subpart Da[13], and
> you have failed every day thereafter to do so.[14]

---

[13] 40 C.F.R. §§ 60.40a-49a (Subpart Da).

[14] Every day since 1983.

## VII. **DISCUSSION**

A. Whether proper pre-suit notice is a jurisdictional prerequisite

As stated above, the notice provision of the CAA applicable to citizen suits, 42

U.S.C. § 7604(b), provides that no action may be commenced prior to 60 days after

the plaintiff has given notice of the violation "to any alleged violator of the standard,

limitation, or order ..." allegedly violated.  Notice under this subsection must be given

in the manner that the administrator of the EPA prescribes by regulation.    The

pertinent EPA regulation regarding the content of the required notices provides as

follows:

> Notices to the Administrator, States, and alleged violators regarding violation
> of an emission standard or limitation ... shall include sufficient information to
> permit the recipient to identify the specific standard, limitation, or order which
> has allegedly been violated, the activity alleged to be in violation, the person or
> persons responsible for the alleged violation, the location of the alleged
> violation, the date or dates of such violation, and the full name and address of
> the person giving the notice.

40 C.F.R. § 54.3(b) (2000).

The Supreme Court, in *Hallstrom*, decided in 1989, stopped short of holding

that giving notice is actually jurisdictional. *Hallstrom,* 493 U.S. 20 at 31; 110 S.Ct.

304 at 311.  And it was interpreting the notice provision in the RCRA (42 U.S.C. §

7002), not the CAA.  The Court presumably was aware that at least one Circuit had

already held that the notice requirements for citizen suits under the Clean Air Act are

19

a jurisdictional prerequisite to suit and must be strictly complied with. *See, Walls v. Waste Resource Corporation,* 761 F.2d 311, 316-17 (6th Cir.1985). The Sixth Circuit Court of Appeals noted in a Clean Water Act (CWA) action that Congress required prior notice because citizen suits were intended to supplement, rather than to substitute for, governmental enforcement. The Sixth Circuit noted:

> [F]ar from being a mere formality, prior notice was viewed by Congress as crucial in defining the proper role of the citizen suit. The citizen suit notice provisions were intended to give the EPA an opportunity to resolve issues regarding the interpretation of complex environmental standards by negotiation, unhindered by the threat of an impending private lawsuit.... Congress evidently believed ... that the private lawsuit should be a supplemental enforcement tool, rather than a substitute for agency involvement.

*Walls v. Waste Resource Corporation,* 761 F.2d 311, 317 (6th Cir.1985).

The Sixth Circuit has revisited the issue since *Hallstrom*: strict compliance with the statutory notice requirements is a mandatory jurisdictional prerequisite to maintaining suit under the CAA and similar environmental laws. *Greene v. Reilly,* 956 F.2d 593, 594 (6th Cir.1992). And, as always, it is the plaintiff's burden to establish the existence of subject matter jurisdiction. *Steel Company v. Citizens for a Better Environment,* 523 U.S. 83, 103-04, 118 S.Ct. 1003, 140 L.Ed.2d 210 (1998).

Because the court finds NPCA's Notice letter insufficient under the facts of this action, it is not necessary to reach the jurisdictional question. The court does have some reservations about notice being a jurisdictional prerequisite: first, Congress

could have explicitly said notice was jurisdictional, and did not say so; second, the

Supreme Court could have said so and did not say so; third, making it jurisdictional

arguably undercuts the Congressional rationale behind citizen suits, which was to

allow private attorneys general to assist in enforcement of the Act. CAA cases are by

definition highly technical actions to prepare and maintain. An unbending insistence

that each offending pollutant be named, that the exact smokestack from which the

pollutant was emitted be named, that every date of illegal emission be stated, and that

the exact statutory and C.F.R. cite be supplied for each violation, seems onerous.

Surely there is a better balance to be struck between allowing sweeping allegations of

broad violations covering many years of alleged violations on the one hand, and what

would amount to a "gotcha"[15] defense on the other if each and every detail of each and

every violation were a minimal jurisdictional requirement.

    For purposes of this opinion it is sufficient to say that, because I hold that

NPCA's Notice letter is insufficient, C., *infra*, the jurisdictional point does not have

---

[15] By this term, the court means the assertion, usually from a plaintiff and not
infrequently in a class action, of a minor, and very technical, violation of a statute, often
accompanied by a huge number of claims that leverages the technical violation into a potential
recovery in the millions, hundreds of millions, or billions, of dollars. It is only an impression,
but the court has the impression of judicial reluctance to find either liability or massive damages
when it comes to such claims. By the same token, a clearly expressed Congressional intent to
permit citizen suits should not be subject to judicially created, and highly technical, door
closings.

to be decided.[16]

B. Whether other barriers to citizen suits remain applicable to this action after *Sierra Club v. TVA*

In the 1990 amendments to the Clean Air Act, Congress added several provisions to the Act which were intended to improve its enforceability. It gave courts the authority to impose civil penalties in citizen suits and required additional monitoring and reporting of emissions . 42 U.S.C. § 7604. The 1990 amendments also created a new permit program (Title V) modeled after the Clean Water Act. 42 U.S.C. § § 7661-7661f.

Until recently, there were significant barriers to enforcement under the Clean Air Act that are not present in the Clean Water Act. *See* Hecker, The Difficulty of Citizen Enforcement of the Clean Air Act, 10 Widener Law Rev. 303 (2004). For example, an enforcement action under the Clean Air Act may lead to a challenge by the defendant of the underlying permit because, unlike the Clean Water Act, the Clean Air Act does not include an antibacksliding or antidegradation provision. Thus, an otherwise straightforward enforcement case may turn into a battle of experts over what

---

[16] This may appear backwards, since jurisdiction is always the point of departure in decision making in a court of limited jurisdiction. Holding that (proper) pre-suit notice was jurisdictional would render moot the sufficiency of the Notice letter. If the Notice letter is factually insufficient, i.e., it doesn't give the defendant the information required by the Act, then saying that notice deprives the court of jurisdiction over that claim doesn't advance the analysis and puts the court into making an unnecessary decision that, in my view, is more appropriately decided by a higher court.

22

the proper permit (BACT or best available control technology) standard is for the plant.

Another significant difference between citizen suits under the CWA and the CAA is complexity of defenses based upon data quality and operational malfunctions. The discharge monitoring reports (DMRs) under the CWA are admissions of violations on the part of the discharger and are very difficult to challenge in an enforcement action. Under the CAA, "any credible evidence" may be used to challenge data quality. 42 U.S.C. § 7413(e); 40 C.F.R. § 60.11(g). TVA also has exemptions not available to CWA defendants: under the new source performance standards (NSPS) of the CAA, "[o]perations during periods of startup, shutdown, and malfunction shall not constitute representative performance unless otherwise specified in the applicable standard." 40 C.F.R. § 60.8(c). This standard invites significant factual disputes over what is representative operation and when a violation has occurred -- a far cry from the straightforward liability decisions based upon DMRs under the CWA.[17]

With the Eleventh Circuit's decision in *Sierra Club v. TVA*, ____ F.3d ____, Slip Opinion No. 04-15324, 2005 WL 3110516 (11th Cir., November 22, 2005), these enforcement defenses have lost traction. The Court of Appeals said that every time

---

[17] Citizen Suits and Defenses Against Them, SJ101 ALI-ABA 885 (2004), p.8.

23

it can be shown with credible evidence that emissions from the Colbert TVA plant, which includes Colbert 5, fail to meet the 20% opacity requirement of the Act and the Alabama State Implementation Plan ("SIP"), the Colbert Plant is in violation of the Act.

Further, the Court of Appeals summarily rejected TVA's arguments, joined by the State of Alabama, that because COMS[18] permitted stricter emissions monitoring than the older Method 9 used by Alabama's ADEM, TVA needed the safe harbor provided by the 2% de minimis rule, or that, in the alternative, the 2% de minimis rule was a reasonable interpretation of the "credible evidence rule".[19] This court's reliance on the "reasonable interpretation" argument, combined with deference this court thought was due ADEM's interpretation of the statute (CAA) it enforces, was explicitly rejected in *Sierra Club v. TVA*, *supra*. The Court of Appeals did not find any support for the argument that when EPA approved Alabama's SIP adoption of the

---

[18] Continuous Opacity Monitoring System. "At the time this lawsuit was filed, the Colbert plant was operating under permits ADEM had issued in March 1998. One of the requirements of the Colbert plant's air permits is that TVA install, maintain, and operate a continuous opacity monitoring system ("COMS") in each of the plant's smokestacks. See Ala. Admin. Code r. 335-3-12-.02(3). As its name indicates, COMS is a device that monitors continuously the opacity of a plume of smoke." *Sierra Club v. TVA*, *supra*, slip opinion at 5.

[19] "Notwithstanding any other provision in [the ADEM regulations], any credible evidence or information relevant to whether a source would have been in compliance with applicable requirements if the appropriate performance or compliance test had been performed, can be used to establish whether or not an owner or operator has violated or is in violation of any rule or standard in this Division." Ala. Admin. Code r. 335-3-1-.13(2).

"credible evidence" rule, EPA intended to modify "implicitly and downward the 20%

opacity limitation". (Slip Op. at 24)   *Sierra Club v. TVA*, *supra*, says that the Act

provides for continuous compliance, 42 U.S.C. § 7602(k), and Alabama's

"interpretation" of its SIP could not change the Act's mandate of continuous

compliance.[20]   *Id.*

The court is aware that Tennessee's SIP incorporates the 2% de minimis rule,

just as it is aware that Georgia's SIP permits a forty per cent (40%) opacity ceiling,

double the amount permitted by Alabama and Tennessee.  This court has no power

over these variances, and this court, after *Sierra Club v. TVA*, *supra*, doesn't have any

questions about the effect of the 2% de minimis rule on emissions violations (none)

and whether or not exceeding the 20 % opacity limitation violates the Act (it does).

C. Whether the NPCA Notice letter complies with the CAA

In *Nat'l Parks Conservation v. TVA*, 175 F.Supp.2d 1071 (E.D. Tenn. 2001)

"*NPCA Tennessee*"), the district court dealt with the same parties (less Sierra Club,

which in light of *Sierra Club v. TVA, supra*, is a distinction without a difference),

similar TVA plants, and alleged CAA violations.  However, the court reads the *NPCA*

*Tennessee* notice letter as more detailed:

---

[20] The court said "By using an informal, non-public, undocumented 'interpretation' method of
revising the SIP before 2003, ADEM short-circuited the important protections against uninformed and
arbitrary rulemaking, and it attempted to avoid entirely EPA oversight of the SIP process".  Slip Opinion
at 26.

The suit will allege that TVA, in its operation of the [Kingston or John Sevier] facility, has regularly violated for at least the last five years, and continues at the present time to violate: (1) the 20% opacity limit in the Tennessee State Implementation Plan [SIP], 40 CFR § 52.2220, *et seq.;* TAPCR 1200-3-5-.01(1) and (2) the 20% opacity limit set forth in the federally applicable provisions of Condition O6 in [the facility's] Operating Permit....

The letters further stated that "[t]he violations of the opacity limitations described above are demonstrated by data from continuous opacity monitors at the ... facility."

175 F.Supp.2d 1071, 1076.

The *NPCA Tennessee* court said NPCA's notice was insufficient for a couple

of reasons, the one applicable here being the lack of specificity. Although the notice

letter(s) did say that TVA had

violated the 20% opacity limit in the Tennessee SIP, it (sic) did not specify the dates of the alleged violations or identify at which sites the violations occurred. Rather, the notice only states that TVA has "regularly violated" the standard "for at least the last five years....". Plaintiff has simply not provided the specificity in its notice which would be required for TVA to determine when its alleged unlawful exceedances had occurred.

175 F.Supp.2d at 1077.[21]

The court believes, like the *NPCA Tennessee* court, that NPCA's Notice letter

is insufficient, and therefore NPCA's Third Cause of Action fails. NPCA's Notice

_____

[21] The court is **not** saying *NPCA Tennessee* is identical to this action. As noted above, Tennessee's SIP contains the 2% de minimis rule and TVA's Tennessee permit, as noted by the *NPCA Tennessee* court, is at least facially valid. *Cf.* Sierra Club v. TVA (EPA never approved the 2% de minimis standard, and it is not part of the Alabama SIP). Also, *NPCA Tennessee* attacked the state for issuing the permit, while here NPCA attacks TVA for not securing PSD and NSR permits before construction, and operating in violation of the Act thereafter.

letter, and its allegations set out at ¶¶ 86 - 91 of the Second Amended Complaint, of broad violations of nearly all, if not all, of the regulations of 40 C.F.R. subpart Da[22] on a daily basis for nearly twenty (20) years, are the notice equivalent of a "shotgun" complaint.[23]

CAA pre-suit notice is not analogous to "notice pleading" under the Rules of Civil Procedure. A defendant is entitled to "sufficient information to permit [it] to identify the specific standard . . . which has allegedly been violated . . . [or] the date or dates of such violations." 40 C.F.R. § 54.3 (2004) The court agrees with TVA that NPCA had to do more than allege daily violations of 40 C.F.R. §§ 60.40a - 60.49a (Subpart Da). Those sections contain a number of requirements, and NPCA should have told TVA which ones it believed TVA had violated, or was continuing to violate. The best example of the reason for this requirement comes from page 12 of NPCA's Response and Opposition, where NPCA says that it is not pursuing TVA for violations of each of three (3) different NSPS emissions rates, but only for alleged $SO_2$ NSPS emission rate violations. This "amendment" to the Notice letter comes years after the

---

[22] 40 C.F.R. §§ 60.40a - 60.49a (Subpart Da).

[23] Such complaints are disfavored. *E.g., Strategic Income Fund, L.L.C. v. Spear, Leeds & Kellogg Corp.*, 305 F.3d 1293, 1295 - 1296 (11th Cir. 2002). ("The typical shotgun complaint contains several counts, each one incorporating by reference the allegations of its predecessors, leading to a situation where most of the counts (i.e., all but the first) contain irrelevant factual allegations and legal conclusions. Consequently, in ruling on the sufficiency of a claim, the trial court must sift out the irrelevancies, a task that can be quite onerous.")

27

fact. With only sixty (60) days to comply, in a capital intensive, highly regulated and highly technical industry, TVA was entitled to more specific information that was sufficient to put it on notice of what it was doing wrong, so it could either attempt to come into compliance, or decide not to and take its chances were it sued. In the example quoted above, TVA should not have had to decide whether the Notice letter was directed at all three (3) pollutants, or one (1) or two (2). This case is not analogous to the CWA cases where a plaintiff demands a defendant stop discharging a specific pollutant into a waterway; there the defendant knows what it's said to be doing wrong and has the opportunity, if in fact it is violating the law, to modify its processes accordingly.

At its core, NPCA's Notice letter, Complaint, and Second Amended Complaint are inextricably tied to TVA's failure to obtain the permits NPCA says were required for the 1982/1983 work at Colbert No. 5. The court cannot read into any of those documents what the court, and everyone else, now knows is the violation that NPCA can prove: Colbert violates the 20% opacity limits as shown by COMS data, and has been doing so regularly since May 20, 1999.[24] *Sierra Club v. TVA*, *supra*.

---

[24] The Alabama credible evidence rule's effective date in the ADEM regulations was May 20, 1999. However, EPA's approval of the Alabama credible evidence rule took effect January 3, 2000, which is the date the rule became a part of the Alabama SIP. Approval and Promulgation of Implementation Plans: Revisions to the Alabama Department of Environmental Management (ADEM) Administrative Code for the Air Pollution Control Program, 64 Fed. Reg. at 59,633. *Sierra Club v. TVA*, fnote 6. The court reads footnote 6 of *Sierra Club v. TVA* as

28

## VIII. SUMMARY

NPCA's Notice Letter is insufficient, and the Third Cause of Action may not proceed to trial. In light of *Sierra Club v. TVA*, *supra*, this may not matter since NPCA cannot obtain civil penalties, and any injunctive relief obtained in *Sierra Club v. TVA* would apply equally here given the identity of parties and the TVA facility involved. Unless NPCA has credible evidence that was not available in *Sierra Club v. TVA*, the periods of provable violations (beginning May 20, 1999 or January 3, 2000 and coming forward) will also be the same, and the relief available in *Sierra Club v. TVA* appears to cover, if not exceed, the relief available to NPCA here should NPCA prevail on all remaining claims.

For the reasons stated, TVA's Motion To Dismiss the Third Cause of Action for NPCA's failure to properly comply with the citizen suit notice provisions of the CAA, which the court treats as a motion for summary judgment, is due to be **GRANTED**.

A separate Order will issue.

Done on December 21, 2005.

*CE Hopkins*

**VIRGINIA EMERSON HOPKINS**
United States District Judge

---

saying it is the date the credible evidence rule became part of Alabama's SIP, January 3, 2000, not the day ADEM made it effective, May 20, 1999, that counts.

29